**IN THE UNITED STATES DISTRICT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

RAMIRO ANTONIO SANDOVAL PIŃON, ON BEHALF OF HIMSELF AND ALL OTHERS
SIMILARLY SITUATED,

     Plaintiff,

v.

FORD MOTOR COMPANY,

     Defendant.

---

## CLASS ACTION COMPLAINT

Plaintiff, Ramiro Antonio Sandoval Pińon, individually and on behalf of himself and all others similarly situated, alleges against Defendant, Ford Motor Company ("Defendant" or "Ford"), the following based upon counsel's investigation of various publicly available sources:

### I.   <u>INTRODUCTION</u>

1.     This is a class action lawsuit brought by Plaintiff individually and on behalf of all current and former owners and lessees of the 2019 Ford Ranger truck, and on information and belief, other affected Ford vehicles (the "Class") that were marketed and sold with overstated fuel economy and inaccurate vehicle emissions claims (the "Class Vehicles").

2.     Ford has admitted that the 2019 Ranger is the first of many Ford vehicles that should be investigated by the government. Since Ford has not described the problem as vehicle specific, the Class Vehicles involved may include other Ford vehicles.

3.      On February 21, 2019, Ford announced that its fuel economy and emissions testing procedures were flawed, thus making the official Environmental Protection Agency ("EPA") fuel economy ratings for the Class Vehicles inaccurate.

4.      These fuel economy ratings result from mandated tests outlined and specified in federal law, and exist to help foster realistic numbers which consumers can use to compare different vehicles – and which are one of the most important factors in their purchase or lease decision.

5.      Ford's EPA fuel economy ratings and advertising statements overstated the actual numbers that the required testing would have produced by a material amount. Specifically, Ford deliberately misrepresented or miscalculated certain road testing factors during internal vehicle testing processes in order to report that its vehicles were more fuel efficient than they actually were.

6.      Defendant conducted inadequate and inaccurate EPA fuel economy testing on various vehicle models resulting in their miles-per-gallon EPA fuel economy ratings being less than that produced by the appropriate federal testing. Ford has admitted that its testing methods were incorrect and produced artificially high fuel economy ratings. These misstatements are material because the EPA numbers provide consumers a necessary tool for comparing vehicles when evaluating them to lease or purchase.

7.      At least by September 2018, Ford's own employees questioned its testing practices and the calculations it was utilizing for fuel economy rates. Ford took no action to correct the problems, or alert consumers that its testing methods were flawed and that they would not get the fuel economy that was promised.

8.      Ford represented to customers that the 2019 Ford Ranger vehicle had achieved

specific mile per gallon estimates of "21 mpg city, 26 mpg highway and 23 mpg combined," making it "the most fuel-efficient gas-powered midsize pickup in America."[1] Ford's representation of the 2019 Ranger as fuel-efficient was a promise that was material to consumers.

9.      Knowing that consumers were concerned with rising fuel prices, Ford utilized its inflated fuel economy claims as part of its marketing to entice consumers to buy or lease Ford vehicles over its competitors.

10.      Ford knew or should have known facts indicating the inaccuracies in the promised gas mileages of the 2019 Ranger and its other vehicles. Defendant consciously or recklessly disregarded facts that indicated the fuel economy ratings were erroneous and overstated. Standard internal testing and investigation, especially reviews precipitated by consumer complaints to the National Highway Traffic Safety Administration's Office of Defects Administration ("ODI"), should have revealed the problem. Ford willfully and uniformly failed to identify and correct its misstatements. Ford's failure to disclose the defects in its fuel economy testing constitutes a breach of the express warranties offered by Ford.

11.      Plaintiff brings this action individually and on behalf of all other current and former owners or lessees of the Class Vehicles who sustained injury as the result of the inaccurate testing methods used by Ford to ascertain the fuel economy ratings of their vehicles and the material misstatements regarding those ratings which were used in the marketing and sales of the Class Vehicles.

12.      Plaintiff and the Class have been damaged by Ford's misrepresentations, concealment, and non-disclosure of the incorrect fuel economy and emissions numbers, because they were misled into purchasing the Class Vehicles of a quality different than they were

---

[1] https://media.ford.com/content/fordmedia/fna/us/en/news/2018/12/11/ford-ranger-rated-most-fuel-efficient-gas-powered-midsize-pickup.html

promised, and paying higher fuel costs they would not otherwise have paid.

13.     Plaintiff brings this action individually and on behalf of all other current and former owners or lessees of the Class Vehicles who sustained injury as the result of the inaccurate testing methods used by Ford. Plaintiff seeks damages, injunctive relief, and equitable relief for Ford's misconduct related to the design, manufacture, marketing, sale, and lease of the Class Vehicles, as alleged in this Complaint.

## II.     <u>JURISDICTION AND VENUE</u>

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiff and Defendant reside in different states. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

15.     This Court also has original jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1), as modified by the Class Action Fairness Act of 2005, because Plaintiff and Defendant are citizens of different states; there are more than 100 members of the Class (as defined herein); the aggregate amount in controversy exceeds $1 million, exclusive of attorneys' fees, interest, and costs; and Class members reside across the U.S. The citizenship of each party is described further below in the "Parties" section.

16.     This Court has personal jurisdiction over Ford pursuant to 18 U.S.C. § 1965(b) & (d) because it has minimum contacts with the United States, this judicial district, and this state, and it intentionally availed itself of the laws of the United States and this state by conducting a substantial amount of business throughout the state, including the design, manufacture, distribution, testing, sale, lease, and/or warranty of Ford vehicles in this state and District. At least in part because of Ford's misconduct as alleged in this lawsuit, the Class Vehicles ended up on this state's roads and in dozens of franchise dealerships.

17.     Venue is proper in this Court under 28 U.S.C. § 1391 because (i) Ford conducts substantial business in this District and has intentionally availed itself of the laws and markets of the United States and this District; and/or (ii) many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia*, Ford's decision-making, design, promotion, marketing, distribution, and sale of the Class Vehicles to Plaintiff in this District. Ford sells a substantial number of automobiles in this District, has dealerships located throughout this District, and the misconduct occurred, in part, in this District. Venue is also proper under 18 U.S.C. § 1965(a) because Ford is subject to personal jurisdiction in this District, as alleged in the preceding paragraph, and Ford has agents located in this District.

## III.   **PARTIES**

### A.  PLAINTIFF

18.     Plaintiff Ramiro Antonio Sandoval Piñon ("Mr. Piñon") is a resident of Federal Heights, Colorado. On or about February 16, 2019, he purchased a new 2019 Ford Ranger pickup for the price of $51,156.77. Mr. Piñon compared the alleged fuel-efficiency of the Ranger with other similar trucks and selected the Ranger truck based on Ford's representations about the vehicle's fuel-efficiency.

19.     Plaintiff purchased the new 2019 Ranger XLT model, with VIN 1FTER4FH0KLA15521, from Loveland Ford Lincoln located in Loveland, Colorado. Plaintiff purchased and still owns this vehicle. Unbeknownst to Plaintiff at the time the vehicle was purchased, it consumed and continues to consume more fuel than advertised. Ford's unfair, unlawful, and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase, in addition to added fuel costs.

20.     Ford knew about or recklessly disregarded the inaccurate fuel economy representations, and computer model, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable but mistaken belief that his vehicle had better fuel economy than competitive vehicles, and would retain all of its promised fuel economy and performance throughout its useful life. Plaintiff selected and ultimately purchased his vehicle, in part, because of the stated "best in class" fuel economy.

21.     Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it. Plaintiff and each Class member has suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of a fuel economy cheat device or the true fuel economy of the Class Vehicles prior to purchase.

B.  DEFENDANT

22.     Ford Motor Company is a Delaware corporation with its principal place of business and national headquarters located in Dearborn, Michigan. Ford vehicles are advertised, distributed, and sold at multiple places of business in all fifty states through Ford's dealers, among other places. Ford engages in continuous and substantial business in Colorado.

23.     Ford and its subsidiaries, affiliates, and other related entities, and its respective employees were the agents, servants and employees of Ford, each of whom was acting within the purpose and scope of that agency and employment.

24.     Ford also developed and disseminated owner's manuals, supplements, and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles, and provided them to its authorized dealers for the express purpose of having these dealers pass such

materials to potential purchasers at the point of sale. Ford also created, designed, and disseminated information about the quality of the Class Vehicles to various agents of various publications for the express purpose of having that information reach potential consumers.

25.     Whenever reference is made to any act by Ford or their subsidiaries, affiliates, and other related entities, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of Ford committed, knew of, performed, authorized, ratified and/or directed that act or transaction for Ford while engaged in the scope of their duties.

## IV.     FACTUAL ALLEGATIONS

26.     Since the mid-1970s, window stickers containing vehicles' Miles Per Gallon ("MPG") estimates have been displayed on vehicles pursuant to the Energy Policy and Conservation Act. The EPA is responsible for providing the fuel economy data that appears on the window sticker. The EPA/DOT Fuel Economy and Environment window sticker contains MPG estimates that are based on standardized laboratory test procedures to ensure that the MPG estimates are "reliable, repeatable, and fair across different car models."[2] This allows the consumer to accurately compare the fuel efficiency among various vehicles. Periodically, the EPA updates its methodology to determine fuel economy to reflect the modernization of vehicles and improving vehicle testing.[3]

27.     In 2017, the EPA updated some of the calculations that manufacturers use to determine EPA fuel economy to better reflect newer more fuel-efficient vehicles.[4]

---

[2] https://nepis.epa.gov/Exe/ZyPDF.cgi/P100IENB.PDF?Dockey=P100IENB.PDF
[3] https://www.epa.gov/fueleconomy/history-fuel-economy-labeling
[4] https://www.epa.gov/fueleconomy/basic-information-fuel-economy-labeling

28.     Manufacturers are responsible for testing their own vehicles with the EPA's standardized laboratory test procedures and then required to report the results to the EPA.[5] Manufacturers are not required to test every vehicle but only "one representative vehicle—typically a preproduction prototype—for each combination of loaded vehicle weight class, transmission class, and basic engine."[6]

29.     In fact, the EPA only reviews and confirms the results of about 15%-20% of vehicles with its own testing,[7] leaving the majority of vehicle fuel economy testing and reporting to the honor system of the manufacturers.

30.     Manufacturers estimate MPG with controlled laboratory tests where a vehicle's drive wheels are placed on a dynamometer ("Dyno") that simulates the driving environment.[8] The vehicle is run through standardized driving routines on the Dyno. The settings of the Dyno takes place in two stages where the actual on-road operation is first characterized and then a measurement called "road load" is used which simulates friction, aerodynamic drag, and tire-related losses.[9]

31.     An EPA guidance letter to car manufacturers, dated February 23, 2015, which aimed to clarify the procedures used in establishing road-load force and Dyno settings, stated that:

> The method a manufacturer elects to use to characterize the road-load force is optional; however, the manufacturer is responsible for the accuracy of the road-load force specification and dynamometer settings. It is also the manufacturer's responsibility to insure that the vehicles it produces conform to the road-load specification reported in the application for certification and used for certification and fuel economy testing.[10]

---

[5] https://www.fueleconomy.gov/feg/how_tested.shtml
[6] https://www.fueleconomy.gov/feg/which_tested.shtml
[7] https://www.fueleconomy.gov/feg/how_tested.shtml
[8] *Id.*
[9] https://www.consumerreports.org/fuel-economy-efficiency/ford-emissions-under-criminal-investigation/
[10] https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1

32.     Ford has consistently promoted the fuel economy of its vehicles. In particular, Ford boasted the 2019 Ford Ranger's fuel efficiency with an EPA-estimated fuel economy rating of 21 mpg in the city, 26 on the highway and 23 combined for its two-wheel drive truck.[11] Ford's four-wheel drive Rangers rated 20 mpg city, 24 highway and 22 mpg combined.[12] "This is best-in-class EPA-estimated city fuel economy rating of any gasoline-powered four-wheel-drive midsize pickup," Ford stated.[13] Ford also promoted its vehicles' fuel economy on its website. Specifially, Ford touts the fuel economy of the 2019 Ranger on Ford.com as "BEST-IN-CLASS EPA-ESTIMATED GAS MPG.[14] Ford further advertises on Ford.com that the 2019 Ford Ranger is "THE MOST FUEL EFFICIENT GAS-POWERED MIDSIZE PICKUP IN AMERICA."[15]

33.     These fuel economy ratings also appeared on the window sticker of the vehicles which consumers use to compare material vehicle qualities to help make informed choices about the cars they buy or lease.

34.     Ford is aware of the importance of fuel economy to consumers and that consumers rely on car manufacturers' advertising campaigns and gas mileage claims when making vehicle purchase or lease decisions.

35.     On February 21, 2019, Ford filed its Form 10-K for the fiscal year ended December 31, 2018 and disclosed for the first time the following:

> Emissions Certification. The Company has become aware of a potential concern involving its U.S. emissions certification process. The potential concern does not involve the use of defeat devices in our products. On February 18, 2019, we voluntarily disclosed this matter to the Environmental Protection Agency, and we will fully cooperate with any

---

[11] https://www.freep.com/story/money/cars/2018/12/11/ford-ranger-fuel-economy-midsize-trucks/ 2267134002/
[12] *Id.*
[13] *Id.*
[14] https://www.ford.com/trucks/ranger/features/?searchid=1686695161|68389309809|402087311489|&ef_id=CjwKC Ajw3azoBRAXEiwA-_64Oj8QnJCk1LlnS37RY-sps-eRj9IRnpfhumx1PWuRyfFojqJUeVN9oBoCv88QAvD_BwE:G:s&s_kwcid=AL!2519!3!336803889107!e!!g!!2019 %20ford%20ranger%20fuel%20economy
[15] https://www.ford.com/trucks/ranger/

9

inquiries. Because this matter is preliminary, we cannot predict the outcome, and cannot provide assurance that it will not have a material adverse effect on us.

36.     Later that day, Ford issued a press release stating that "[i]n September, a handful of employees raised a concern through our Speak Up employee reporting channel regarding the analytical modeling that is part of our U.S. fuel economy and emissions compliance process." The release further stated that Ford had hired an outside firm to investigate the vehicle road load specifications used in its testing of emission and fuel economy and that the firm would be "evaluating potential changes to our road-load modeling process, including engineering, technical and governance components."

37.     On the same day, in response to Ford's announcement, the EPA said that the information from Ford's investigation is "too incomplete for EPA to reach any conclusions. We take the potential issues seriously and are following up with the company to fully understand the circumstances behind this disclosure."[16]

38.     This is not Ford's first fuel economy error. It has faced problems due to errors in fuel economy claims in previous years. For example, in 2013 Ford overstated the fuel economy for its C-Max hybrid model by seven miles per gallon and in 2014 lowered fuel economy ratings for six other models and offered compensation to customers. [17]

39.     Ford willfully intended for consumers to rely on its advertised MPG estimates and attempts to mask the actual MPG estimates.

---

[16] https://ca.reuters.com/article/businessNews/idCAKCN1QA2U0-OCABS
[17] https://www.reuters.com/article/us-autos-ford-emissions/u-s-opens-criminal-probe-into-ford-emissions-certification-idUSKCN1S21BD

## V.    **CLASS ACTION ALLEGATIONS**

40.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3) individually and as a class action on behalf of the following proposed classes:

**Nationwide Class: All persons in the United States who purchased or leased a Class Vehicle (the "Nationwide Class").**

41.    Excluded from the Class are Defendant, its parents, subsidiaries and affiliates, directors and officers, and members of its immediate families, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the Class definition if discovery and/or further investigation reveals that it should be expanded or otherwise modified.

42.    Plaintiff reserves the right to establish subclasses where appropriate.

43.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, and the facts are presently within the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes hundreds of thousands of Class Vehicles have been sold and leased throughout the United States and in this state.

44.    **Commonality and Predominance**: There are questions of law or fact common to the Class that predominate over any questions affecting individual members. Those questions include, but are not limited to, the following:

   a.   whether Ford engaged in the conduct alleged herein;

   b.   whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

   c.   whether Ford designed, manufactured, marketed, distributed, leased, sold or otherwise placed Class Vehicles into the stream of commerce in the United States when it knew, or should have known, that the fuel-economy ratings of the Class Vehicles were false;

d. whether Ford knowingly failed to disclose that the fuel-economy ratings of the Class Vehicles were false;

e. whether, as a result of Defendant's omissions and/or misrepresentations of material facts related to the Class Vehicles' fuel economy, Plaintiff and the other members of the Class have suffered ascertainable loss of moneys and/or property and/or value;

f. whether Plaintiff and the other members of the Class are entitled to monetary damages and/or other remedies, and if so the nature of any such relief;

g. whether Defendant deliberately misrepresented or failed to disclose material facts to Plaintiff and the other members of the Class;

h. whether Ford was unjustly enriched at the expense of the Class; and

i. whether Plaintiff and the other members of the Class are entitled to equitable relief in the form of rescission of the purchase agreement or other injunctive relief and, if so, in what amount.

45. **Typicality**: Plaintiff's claims are typical of the claims of the Class since Plaintiff purchased a Class Vehicle with a false fuel economy rating, as did each member of the Class. Furthermore, Plaintiff and all members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Defendant's wrongful conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent Class members.

46. **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class as he has retained counsel experienced in pursuing complex class action litigation and he intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

47. **Superiority**: Class action treatment is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and the other members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by

Defendant's conduct. It would be virtually impossible for members of the Class to individually redress the wrongs done to them effectively. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation in this case presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties as well as the court system, due to the complex legal and factual issues. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendant's vehicle identification numbers, warranty claims, registration records, and database of complaints.

48.     Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to them as a whole.

49.     Without a class action, Defendant will likely retain the benefit of its wrongdoing and will continue a course of action which will result in further damages to Plaintiff and the other members of the Class.

## VI.     TOLLING OF STATUTES OF LIMITATION

50.     Any applicable statutes of limitation have been tolled by Ford's knowing and active concealment, denial, and misleading actions, as alleged herein. Plaintiff and the other members of the Class above were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part. Plaintiff and the other members of the Class could not have reasonably discovered that the fuel economy ratings were not accurate until Ford had disclosed this information which was shortly before this class action litigation was commenced.

51.    Ford is under a continuous duty to disclose to Plaintiff and the other members of the Class the true character, quality and nature of the Class Vehicles, and to disclose the truth regarding the fuel economy ratings. Ford knowingly, affirmatively and actively concealed the true fuel economy ratings of the Class Vehicles. Plaintiff and the other members of the Class reasonably relied upon Ford's knowing, affirmative and active concealment. Based on the foregoing, Ford is estopped from relying on any statutes of limitation as a defense in this action.

52.    Plaintiff and the other members of the Class could not have known that the Class Vehicles were marketed, sold and leased with false fuel economy ratings, as a result of Ford's fraudulent concealment of the true MPG and EPA fuel economy ratings of the Class Vehicles. Plaintiff and the other members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the fuel economy of the Class Vehicles.

**VIOLATIONS ALLEGED**

**COUNT I**
**VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT**
**(On Behalf of the Class)**

53.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

54.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a) and (d).

55.    Plaintiff brings this Count individually and on behalf of all Class members.

56.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

57.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

14

58.     Plaintiff and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

59.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

60.     As described above, Defendant expressly warranted in advertisements that the Class Vehicles experienced fuel economy efficiency. These written warranties fall within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

61.     Under 15 U.S.C. § 2301(7), Defendant created implied warranties for the Class Vehicles.

62.     With respect to Class members' purchases or leases of the Class Vehicles, the terms of Ford's express and implied warranties became part of the basis of the bargain between the parties.

63.     Ford breached these warranties as described in more detail above. Without limitation, the Class Vehicles experience less MPG than represented by Ford.

64.     Plaintiff and the other members of the Class are in privity with Defendant in that they purchased or leased the Class Vehicles from Defendant or its agents.

65.     It is unnecessary and futile to afford Ford a reasonable opportunity to cure their breach of written warranties. Ford knew or should have known of the misrepresentations concerning the Class Vehicles' fuel economy ratings at the time of sale or lease of each Class Vehicle, but failed to rectify the misrepresentations. Consequently, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiff or Class members resort to an informal dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

66.     As a direct and proximate result of Ford's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiff and the other members of the Class have sustained damages in an amount to be determined at trial.

67.     All jurisdictional prerequisites have been satisfied.

68.     Plaintiff, individually and on behalf of the Class, seeks all damages permitted by law, including diminution in the value of their vehicles, in an amount to be proven at trial.

## COUNT II
## BREACH OF EXPRESS WARRANTY
### (On behalf of the Class)

69.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

70.     Defendant at all times was a merchant with respect to motor vehicles.

71.     In selling its vehicles, Defendant expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles experienced a favorable fuel economy of specific MPGs, depending on the vehicle.

72.     These affirmations and promises were part of the basis of the bargain between the parties.

73.     Defendant breached these express warranties arising from its advertisements, including window stickers, because the fuel economy ratings for its vehicles are inaccurate.

74.     As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and the other members of the Class have been damaged in an amount to be determined at trial.

## COUNT IV
## NEGLIGENT MISREPRESENTATIONS

75.     Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

16

76.     Defendant made fuel economy representations to Plaintiff and the other members of the Class that were not true.

77.     Defendant had no reasonable grounds for believing these representations were true when made, yet intended that Plaintiff and the other members of the Class rely on these misrepresentations.

78.     Plaintiff and the other members of the Class reasonably relied on Defendant's representations and as a result, were harmed.

**COUNT V**
**COMMON LAW FRAUD**
**(On behalf of the Class)**

79.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein. Defendant made material misrepresentations and omissions concerning a presently existing or past fact. For example, Defendant did not fully and truthfully disclose to its customers accurate fuel economy ratings of the Class Vehicles. As a result, Plaintiff and the other members of the Class were fraudulently induced to lease or purchase the Class Vehicles based on false fuel economy ratings.

80.     These omissions and statements were made by Defendant with knowledge of their falsity, and with the intent that Plaintiff and the other members of the Class rely on them.

81.     Defendant affirmatively misrepresented and concealed material facts concerning the fuel economy of the Class Vehicles.

82.     Defendant had a duty to disclose the true fuel economy based on its superior knowledge and affirmative misrepresentations to the contrary.

83.     Defendant affirmatively misrepresented and/or actively concealed material facts, in whole or in part, intending to induce Plaintiff and the other members of the Class to purchase or lease their vehicles and at a higher price than they otherwise would have.

84.     Plaintiff and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

85.     Ford made the omissions and concealment of material facts discussed above with knowledge of the effect of concealing these material facts. Ford knew that by misleading consumers, Ford would sell or lease more Class Vehicles.

86.     Plaintiff and the other members of the class justifiably relied upon Ford's knowing, affirmative and active concealment. By concealing material information about the Class Vehicles' fuel economy ratings, Ford intended to induce Plaintiff and the other members of the Class into purchasing or leasing the Class Vehicles.

87.     As a direct and proximate result of Ford's omissions and active concealment of material facts, Plaintiff and the other members of the Class have been damaged in an amount according to proof at trial.

<u>**COUNT VI**</u><br>
**UNJUST ENRICHMENT**<br>
**(On behalf of the Class)**

88.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein. Defendant distributed the Class Vehicles into the stream of commerce with the knowledge that these vehicles would be purchased or leased by consumers based on a reasonable expectation that its representations related to fuel economy ratings were accurate.

89.     Defendant distributed the Class Vehicles with the knowledge that the fuel economy ratings were false which made the Class Vehicles worth less than the price being paid for them.

90.     Because of their wrongful acts and omissions, Defendant charged a higher price for its vehicles than the vehicles' true value and Defendant obtained monies which rightfully belong to Plaintiff.

91.     Defendant received an economic benefit at the expense of the consumers of the Class Vehicles.

92.     In the circumstances, principles of equity and good conscience make it unjust for Defendant to retain the benefit conferred on it by consumers of the Class Vehicles and Defendant should be required to pay for this benefit.

## COUNT VII
## BREACH OF CONTRACT
### (On behalf of the Class)

93.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

94.     Defendant has expressly and unambiguously sold or leased the Class Vehicles, claiming false and inflated fuel economy ratings as more fully set forth herein. Plaintiff and the other members of the Class purchased or leased Defendant's Class Vehicles which constitute valid contracts with Defendant.

95.     The fuel economy ratings of the Class Vehicles, as claimed in Defendant's marketing and advertising, constitute terms or representations which form the basis of the contract for Plaintiff and the other members of the Class with Defendant.

96.     Defendant failed to perform as required by the contracts and breached the contracts by delivering the Class Vehicles with markedly less fuel economy than advertised.

97.     As a result of the foregoing, Plaintiff and the other members of the Class are entitled to compensatory damages, plus interest, costs and such additional relief as the Court may deem appropriate or to which Plaintiff and the Class may be entitled.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the other members of the Class, respectfully requests that this Court grant the following relief:

A.    Allow this action to proceed as a class action under Rule 23 for all claims alleged, appointing Plaintiff as the representative of the Class and the undersigned counsel as counsel for the Class;

B.    Enter judgment against Defendant in favor of Plaintiff and each member of the Class, in the amount of actual and compensatory damages, and pre-and post-judgment interest as allowed by law and enjoin Defendant from future violations;

C.    Award all actual, general, special, incidental, statutory, treble, punitive, and consequential damages to which Plaintiff and the other members of the Class are entitled;

D.    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order requiring Defendant to notify all Class members about the inaccurate fuel economy ratings of the Class Vehicles and provide correct fuel economy ratings;

E.    Award Plaintiff and the other members of the Class attorneys' fees and costs incurred in this litigation; and

F.    Grant Plaintiff such further relief that this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, by his counsel, hereby demands a trial by jury on all claims and issues so triable.

Dated: July 15, 2019

*/s/ Margeaux R. Azar*

Margeaux R. Azar (#53409)
Ivy T. Ngo (admitted)
**Franklin D. Azar & Associates, P.C.**
14426 East Evans Avenue
Aurora, CO 80014
Telephone: (303) 757-3300
Fax: (720) 213-5131
Email: azarm@fdazar.com
Email: ngoi@fdazar.com

*Counsel for Plaintiff Ramiro Antonio Sandoval
Piñon and the Proposed Class*